# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN
## GREEN BAY DIVSIION

---

**PIT ROW, INC., et. al.,**

      Plaintiffs,

  v.                                   Case No.: 20-CV-738

**COSTCO WHOLESALE CORPORATION,**

      Defendant.

---

## *AMICUS* BRIEF OF WISCONSIN PETROLEUM MARKETERS & CONVENIENCE STORE ASSOCIATION

---

Heath G. Mynsberge, Esq.
State Bar No. 1079827
Samuel J. S. Moheban, Esq.
State Bar No. 1119485
Dempsey Law Firm, LLP
210 N. Main Street
Oshkosh, WI 54902
Telephone: 920.235.7300
Facsimile: 920.235.2011
Email: hgm@dempseylaw.com

## INTEREST OF *AMICUS CURIAE*

Initially formed in 1926, the Wisconsin Petroleum Marketers and Convenience Store Association ("WPMCA") is a non-stock corporation, trade association, which represents retailers of motor vehicle fuel throughout the State of Wisconsin. In fact, the WPMCA's membership manages over 3,000 gas stations and convenience stores in the State of Wisconsin. The WPMCA was formed, among other reasons, to address matters industry-wide and to protect the many independent convenience store operators that call Wisconsin home. As such, the members of the WPMCA are our neighbors and are greatly impacted by issues surrounding the Unfair Sales Act (the "Act") making them well-positioned to address the issues presented to the Court in this case.

In this suit, the Court is being asked to determine issues of substantial state-wide importance that go to the very bedrock of the Act; the interpretation of the Act's "meeting competition" defense, Wis. Stat. § 100.30(6)(a)7. Stated simply, adopting the positions of Costco Wholesale Corporation ("Costco") in this matter would frustrate the purposes of the Act. Costco's positions would eliminate any objectivity as it relates to the "meeting competition" defense and would allow these large, sophisticated, and wealthy, retailers of motor vehicle fuel to write their own definition in whatever fashion pleases them, contrary to all common sense and market realities.

The WPMCA, on behalf of their membership, submits this *amicus curiae* brief to provide the Court with additional argument, materials, and important legislative histories with the hope of fully briefing and informing the Court on both the historical context of the Act as well as the impact of this decision on the state on a macro, state-wide, level.

## INTRODUCTION

The Unfair Sales Act was established in 1939 as a way to protect retailers from unfair pricing policies and, specifically, sales for loss. The Act has gone through various revisions over the years (which will be addressed in more detail, below) until it took its current form. Many – especially

larger corporations – have argued that the Act is anti-free market and does not foster true competition. Stated simply, that is not the case. A retailer affected by the Act is not guaranteed any specific profit; all a retailer is guaranteed is a fair market in which to compete. By its very terms, the Act encourages competition be allowing retailers to match the competition of "direct competitors." Wis. Stat. §§ 100.30(2)(cj), (6)(a)7. Accordingly, the Act does not prohibit competition, it simply places retailers on a level playing field and prohibits a retailer from selling below "cost[1]" in an effort to reduce or eliminate competition.

Despite the long history of the Act, there is scant guidance on how a retailer determines who can be a "direct competitor" for purposes of the "meeting competition" exception of the statute. Wis. Stat. § 100.30(6)(a)7. The only, consistent, source of guidance has come from the Wisconsin Department of Agriculture, Trade, and Consumer Protection ("DATCP") which is charged with the duty to investigate and enforce the Act as well as the responsibility to establish procedures for the interpretation of the same. Wis. Sat. §§ 100.30(7)(a); 93.07(1). DATCP has promulgated regulations and provided other guidance regarding the interpretation of "direct competitor" for decades and, after the decision of Tetra-Tech, has formalized that guidance by publishing a "Meeting Competition Check List" on October 15, 2019[2]. Tetra Tech EC, Inc. v. Wisconsin Dep't of Revenue, 2018 WI 75, 84, 382 Wis. 2d 496, 914 N.W.2d 54. That document establishes an objective, market-based, analysis that has been historically followed by DATCP and retailers throughout the state for years prior to it being formalized by DATCP's official action in October of 2019.

In this litigation, Costco seeks to gut the only well-established procedures for determining who can be a "direct competitor" in favor of a loose, retailer-by-retailer, approach to "direct

---

[1] As that word is defined throughout the Act.
[2] https://datcp.wi.gov/Documents/MeetingCompetitionCheckList.pdf

competition" that would allow large, sophisticated, companies like itself to draft their own elements of who "direct competition" is without looking at the economic realities of the markets in which the retailers operate. Among other arguments made in its brief, Costco posits that it satisfied the "meeting competition" defense contained within Wis. Stat. § 100.30(6)(a)7 by, among other things:

1. "Meeting competition" of a retailer twenty-two miles away based on a customer or two (at best) per day;

2. "Meeting competition" of a discount program that does not impact the "sale" price of a proffered "direct competitor"; and

3. Various factual defenses.

To have a full picture of these issues, the WPMCA will address the first two of these defenses through a review of:

1. The statutory history of the Act;

2. The need for an objective, rather than subjective, determination of "direct competitor";

3. The need to isolate the "posted" prices from discount offers that, often times, are made at the refiner level and do not impact the retailer's bottom line; and

4. The importance of the shifting of presumptions and statutory language at issue in this matter.

The Court's decision in this matter will, hopefully, provide some clarity on these important matters and, with any luck, will reject the contentions of Costco which, if accepted, would violate the fundamental, bedrock, principles of the Act and render the same unenforceable to large, wealthy, sophisticated retailers such as Costco.

## ARGUMENT

### 1. The History of the Act.

The Act itself is crystal clear in its purpose because the Legislature has statutorily defined the Policy:

POLICY. The practice of selling certain items of merchandise below cost in order to attract patronage is generally a form of deceptive advertising and an unfair method

of competition in commerce. Such practice causes commercial dislocations, misleads the consumer, works back against the farmer, directly burdens and obstructs commerce, and diverts business from dealers who maintain a fair price policy. Bankruptcies among merchants who fail because of the competition of those who use such methods result in unemployment, disruption of leases, and nonpayment of taxes and loans, and contribute to an inevitable train of undesirable consequences, including economic depression.

Wis. Stat. § 100.30(1). The Act was enacted in 1939 and modeled after the proposed Model State Unfair Sales Act prepared by the National Food and Grocery Conference Committee which was formed in response to the Supreme Court's ruling that the National Industrial Recovery Act of 1933 was unconstitutional.[3] The original Unfair Sales Act provided a minimum markup of 3 to 6 percent for all merchandise sold in Wisconsin.[4] Between 1939 and 1985 the Act was amended multiple times but remained substantially unchanged.[5] Early on, whenever the Act faced negative treatment by the Wisconsin Supreme Court, the Legislature immediately amended the Act to negate the decisions of the Court, showing a clear legislative intent in favor of this Policy.[6] In 1967, the Wisconsin Supreme Court upheld the constitutionality of the Act but invited legislative action to review, and potentially repeal the Act.[7] Between 1967 and 1983, numerous attempts were made to repeal or limit the Act but none were successful.[8]

In 1985, the Act was scaled back after efforts to repeal it fell short.[9] The original draft of the 1985 Wis. Act 313, Assembly Bill 219, "would have eliminated the minimum markup for all merchandise except for cigarettes sold by wholesalers" and merely require that all other merchandise

---

[3] Wis. L. 1939, c.56 (drafting file); William Finn Collins, Comment, Trade Regulation – Wisconsin Loss Leader Statute, 1941 Wis. L. Rev. 380, 428 (1941).
[4] Wis. Stat. § 100.30 (1939); Orion Flight Servs., Inc. v. Basler Flight Serv., 2006 WI 51, ¶¶ 64-68.
[5] Id.
[6] A.J. Feifarek, Comment, Trade Regulations: The Loss Leader Statutes in Wisconsin, 1948 Wis. L. Rev. 383, 401 (1948).
[7] Michael P. Waxman, Wisconsin's Unfair Sales Act – Unfair to Whom, 66 Marq. L. Rev. 293, 293 (1983).
[8] Id.
[9] Wisconsin Merchants Federation Memorandum to Assembly Consumer Affairs Committee May 9, 1997 (hearing records).

be sold at cost or higher.[10]  The final result of the 1985 amendment to the Act was that it eliminated the minimum markup provisions for all merchandise except for "cigarettes or other tobacco products, fermented malt beverages, intoxicating liquor or wine or motor vehicle fuel." [11] Since 1985, there has only been one major amendment of the Act. That amendment, 1997 Wis. Act 55, Assembly Bill 283, created a private cause of action for the enforcement of the Act and created motor vehicle fuel specific rules for the calculation of the minimum markup.  This was necessary because the State of Wisconsin does not have the resources to enforce all of the violations throughout the State.

The general purpose of the Act is fairly clear, however there has been some confusion over who the Act is intended to protect. The original 1939 Act contained a policy statement that has remained unchanged to this day.[12] That policy statement identifies "misleading the consumer, working back against suppliers, and diverting business from competitors who maintain a fair price policy" as specific concerns that the Act is intended to address. The policy statement also expresses concerns of the negative macroeconomic concerns that the Act is intended to prevent, including bankruptcy of competitors, unemployment, disruption of leases, nonpayment of taxes and loans, and ultimately economic depression. Given the economic conditions of the late 1930s, when the Act was originally enacted, it is not surprising that Legislature was concerned about the macroeconomic effects of price wars in a deflationary economic climate. Because the language of the Act's policy statement has remained unchanged, and because of the extraordinary economic conditions and government overreach of the 1930s, many have criticized the Act as being an outdated depression era overreaction to an economic emergency that no longer exists.[13] However, reducing the purpose

---

[10] Orion, 2006 WI 51, ¶¶ 64-68.
[11] Id.
[12] Wis. Stat. § 100.30(1).
[13] State v. Ross, 259 Wis. 379, 388-89 (1951) (Gehl, J., dissenting); Flying J, Inc. v. Van Hollen, 597 F. Supp. 2d 848, 851 (E.D. Wis. 2009), rev'd, 621 F.3d 658 (7th Cir. 2010); Wisconsin Merchants Federation

of the Act to a great depression era response to an economic emergency would ignore the evolution of the Act into its modern form, ignore the many examples where the Legislature rebuffed invitations to repeal the Act throughout the decades, and ignore how the Act actually operates to protect *both* competitors and consumers.

The best interpretation of the purpose of the Act is that it is intended to prevent "sales" below the various "cost to retailer" calculations to protect competitors from predatory pricing in order to ensure that markets remain competitive. These protections to competitors provide ongoing protection to consumers by preventing deceptive advertising and benefiting consumers in the long-term by keeping markets competitive and prices competitive. The policy statement's concerns regarding suppliers, employees, landlords, creditors, and the economy as a whole are thus only the logical continuance of the indirect potential negative effects of not prohibiting predatory pricing.

The intent of the Act to protect competitors from predatory pricing is well established.[14] While some have interpreted the Act to only be intended to protect small business or "mom and pop" establishments[15], this interpretation has been expressly rejected by the Supreme Court of Wisconsin on multiple occasions[16]. Though it is logical that opportunity for predatory pricing would likely only arise when one business has greater resources than its competitor, the requisite imbalance of resources is relative and, therefore, predatory pricing is certainly not only viable against small businesses or "mom and pop" establishments but even substantial operations such as Costco.

---

Memorandum to Assembly Consumer Affairs Committee, May 9, 1997 (hearing records); James I. Brannon & Frank Kelly, Pumping Up Gas Prices in Wisconsin: The Effects of the Unfair Sales Act on Retail Motor vehicle fuel Prices in Wisconsin, 2 (Wis. Pol'y Res. Inst. Rep., 12-7, October 1999); [countless newspaper articles throughout the decades – available if needed].

[14] Orion Flight Servs., Inc. v. Basler Flight Serv., 2006 WI 51, ¶ 28; Vill. Food & Liquor Mart v. H & S Petroleum, Inc., 2002 WI 92, ¶ 28; Bhandari v. Nilsestuen, 2012 WI App 73, ¶ 18 (unpublished opinion); Waxman at 298;

[15] Orion Flight Servs., Inc. v. Basler Flight Serv., 2004 WI App 222, ¶¶ 1, 23.

[16] Orion Flight Servs., Inc. v. Basler Flight Serv., 2006 WI 51, ¶ 31.; Gross v. Woodman's Food Mkt., Inc., 2002 WI App 295, ¶ 45.

The intent of the Act to protect consumers is based on two separate lines of thinking. First the Act protects consumers from deceptive advertising. The intent of the Act to protect consumers in this manner is expressly stated in the Act's policy statement and the logic behind it is that a consumer is likely to make incorrect assumptions about the prices for all of the retailer's merchandise based on the price of the loss-leader. Clearly it would be unsustainable for a retailer to sell all of their merchandise below cost and therefore the loss-leader that attracts the customer cannot be representative of the retailer's prices for other merchandise. As discussed in Plaintiffs' brief, Costco has proudly implemented loss-leaders as a core component of their competitive strategy.

The second method in which the Act benefits consumers is more controversial as it is based on the underlying assumptions regarding the efficacy of the Act's prohibition on sales below cost. Assuming that the Act does, in fact, help ensure that markets remain competitive, consumers should benefit in the long-term because the prices will remain reasonable through free-market competition (despite the price floor). However, the Act may harm consumers in the short term as consumers would benefit from a price-war until the losing competitor exits the market. Of course, though, that short term benefit would be met with long-term pain as the surviving retailer has the freedom to set higher prices due to lack of competition.

The second method – prohibiting sales below cost – had not been regularly enforced historically. There are three main reasons for this lack of enforcement. First, economic conditions since the passage of the Act have been relatively favorable with no major periods of deflation.[17] Second, until the 1997 amendment, there was no simple and precise manner for outsiders to

---

[17] See Feifarek at 401 (stating that conditions have been very favorable in the decade after the Act's passage).

Case 1:20-cv-00738-WCG    Filed 03/16/22    Page 8 of 24    Document 117-10

calculate the cost of motor vehicle fuel for a specific retailer or wholesaler.[18]  Finally, there was no

effective private enforcement mechanism until the 1997 amendment added a private cause of action

for damages and professional fees.[19]

There have been numerous methods used by retailers and wholesalers to try to find

loopholes in the Act. One early method was to beat a competitor's price under the guise of meeting

competition.[20] Another method was to claim that a coupon given by a retailer to a customer was a

trade discount that reduced the cost to the retailer under the Act.[21] A third method was to claim

mandatory standard discounts and electronic fund transfer discounts as reductions in sales price

when the Act specifically precludes the ability of certain wholesalers to subtract rewards for prompt

payment.[22]

A review of the legislative history of the modern Act provides some key points for the

changes to the Act through Assembly Bill 283 – Act 55.  Specifics from that legislative file[23] include

considerations that:

- The Act protects fair competition. (Testimony of Kent Baumon (Condon Oil
  Company). Letter from Petroleum Marketers Association of Wisconsin ("PMAW";
  now known as the WPMCA).)/Wisconsin Association of Convenience Stores
  ("WACS").

- The Act is good for consumers because it keeps prices low. (Testimony of Kent
  Baumon (Condon Oil Company).)

---

[18] Letter from Petroleum Marketers Association of Wisconsin and Wisconsin Association of Convenience
Stores to Assembly Consumer Affairs Committee (May 8, 1997)(now known as the WPMCA); Testimony of
Kent Bauman, Condon Oil Company, before Assembly Consumer Affairs Committee (May 8, 1997).
[19] Waxman at 301-302, 309-310; Letter from Petroleum Marketers Association of Wisconsin and Wisconsin
Association of Convenience Stores to Assembly Consumer Affairs Committee (May 8, 1997) (now known as
the WPMCA); Testimony of Kent Bauman, Condon Oil Company, before Assembly Consumer Affairs
Committee (May 8, 1997).
[20] Heiden v. Ray's Inc., 34 Wis. 2d 632, 642 (1967).
[21] State v. Eau Claire Oil Co., 35 Wis. 2d 724, 740, 151 N.W.2d 634, 642 (1967)
[22] Eby-Brown Co. LLC. v. Wisconsin Dep't of Agr., Trade & Consumer Prot., 213 F. Supp. 2d 993, 1009
(W.D. Wis. 2001), aff'd sub nom. Eby-Brown Co., LLC v. Wisconsin Dep't of Agric., 295 F.3d 749 (7th Cir.
2002), as amended on denial of reh'g (Aug. 12, 2002)
[23] Should the Court desire a copy of the legislative file, the WPMCA will be happy to provide one.  However,
the file itself is quite substantial.

- The Act protects independent retailers. (Letter from PMAW/WACS.)

- The Act provided protection from predatory pricing by big oil companies and warehouse stores. (Testimony of Kent Baumon (Condon Oil Company). Letter from PMAW/WACS.)

- The Act provided a mechanism for enforcement because, until that point, there was a general lack of enforcement. (Testimony of Kent Baumon (Condon Oil Company).)

- The Act provided a simple, uniform, mechanism for calculating the actual cost of fuel, especially for refiners that own the oil from the minute it comes out of the ground. (Testimony of Kent Baumon (Condon Oil Company). PMAW/WACS

Similar policy reasons have been recognized in Wisconsin jurisprudence in the decades since the passage of the Act. Specifically:

- "The so-called Unfair Sales Act is designed to thwart the disposition to engage in reckless competition by outlawing the "loss leader" as an instrument in merchandising." State v. 20th Century Mkt., 236 Wis. 215, 294 N.W. 873 (1940).

- "Regulations are themselves artificial intrusions which disrupt the free market. However, left to its own devices, the free market bears the seeds of its own destruction, such as when a seller underprices its products to drive its competitors out of business, thereby ultimately leaving the field to itself to set whatever price it wants. The purpose of the Unfair Sales Act is to ensure that does not happen." PDQ Food Stores, Inc. v. Speedway SuperAmerica, LLC, No. 99-CV-2756, 2000 WL 33418835 at *3 (Wis. Cir. Ct. June 8, 2000)[24].

- "[S]elling below cost is really an act of unfair competition.... Sales below cost, it has been stated, are prohibited because 'ruinous competition by lowering prices has been recognized as an illegal medium of eliminating weaker competitors,' and because 'in many lines of industry larger combinations of capital through lower costs and through cutting prices below costs have driven smaller merchants out of business.'" Vill. Food & Liquor Mart v. H & S Petroleum, Inc., 2002 WI 92, ¶ 28.

- "Under this express statement of intent, the policy of Wis. Stat. § 100.30 is to protect Wisconsin consumers and merchants against unfair competition in commerce. The statute seeks to achieve this policy by prohibiting the sale of merchandise below cost." Orion Flight Servs., Inc. v. Basler Flight Serv., 2006 WI 51, ¶ 28.

- "To summarize so far, the legislature stated that the Act is intended to prevent below-cost sales in order to, among other goals, encourage the survival of businesses that maintain 'fair price polic[ies],' and DATCP's expert opinion provides evidence that the

---

[24] Courtesy copy attached.

Act fulfills this design of maintaining a reasonable number of competitors in this market, with the additional benefit of lowering prices with respect to motor vehicle fuel sales. Thus, DATCP's expert provides evidence that the Act helps achieve at least one of the legislature's express goals, as well as evidence that the Act results in lower prices for consumers, an additional rational goal that is at least implicit in or consistent with the legislature's express goals." <u>Bhandari v. Nilsestuen</u>, 2012 WI App 73, ¶ 18 (unpublished opinion).

- "When considered in isolation, the phrase 'a fair price policy' used by the legislature in the Act's policy statement is an ambiguous term that requires context to give it meaning. However, when read in context it is clear that the legislature meant 'fair because not below cost.'" <u>Bhandari v. Nilsestuen</u>, 2012 WI App 73 n.6 (unpublished opinion).

- "A civil action for equitable relief was contained in the original act under Wis. Stat. § 100.30(5), which was later followed by affording private litigants the ability to bring a civil action for monetary damages pursuant to Wis. Stat. § 100.30(5m). The legislative intent was clearly to provide an additional means of enforcement. The fact that one is undertaken in the civil context, rather than the criminal context, should not deprive the parties of a jury trial in this instance." <u>Vill. Food & Liquor Mart v. H & S Petroleum, Inc.</u>, 2002 WI 92, ¶ 29.

Admittedly, much of these protections have been focused on smaller retailers:

- "The Wisconsin Unfair Sales Act was enacted in 1939 during the Great Depression to prevent large retailers from selling below cost, an 'act of unfair competition' which was seen as one of the primary causes of small business failures. Despite numerous amendments during the almost half century since its passage, its ostensible purpose has remained the same: to protect small retailers from predatory pricing." Waxman at 293.

- "Although the little Robinson-Patman Act and the Unfair Sales Act were passed at different times, they arose from the same concern for protecting small business from mass-merchandiser economic power. The former was intended to protect small business from large purchasers exercising their more powerful buying power. The latter was intended to protect small businesses from being undersold by larger businesses selling at low prices. The latter was reinforced by the Wisconsin Fair Trade Act." Waxman at 296.

- "The Wisconsin Unfair Sales Act is very similar to most unfair sales acts passed in the 1930's after the NRA was declared unconstitutional. Intended to rectify the imbalance of power that permitted mass merchandisers to sell at a lower price than small businesses (especially below cost loss leaders), it was primarily directed at retail sales to the ultimate consumer rather than wholesale operations. As set forth in the policy section of the Act, 'the practice of selling below cost in order to attract patronage is generally a form of deceptive advertising and an unfair method of competition in commerce.'" Waxman at 297.

- "The Wisconsin Unfair Sales Act has three particular purposes: (1) to prevent unfair discrimination by wholesalers; (2) to prevent "predatory price-cutting" by wholesalers and retailers; and (3) to protect small retailers by requiring that sales prices be at least a certain percentage above cost. In order to protect small business from the disastrous consequences of price-cutting the Wisconsin Unfair Sales Act established a 'fair price policy' and a method of computing a 'fair price.' The fair price policy is, simply stated, that the selling price for a retailer shall be greater than 'cost' as defined by the statute. Cost to the retailer (in the absence of proof of a lesser cost) is the retailer's purchase cost plus overhead plus six percent. Cost to the wholesaler equals the wholesaler's purchase cost plus overhead plus three percent. Thus, subject to certain specific statutory defenses, advertising or offering for sale or selling below cost is illegal." Waxman at 298.

- Also, small independent[s] cannot afford to use loss leaders and is unable to compete with stores that do. Collins at 428.

The Act, though, is not focused only on protecting the small, mom-and-pop, shop. The fact the Act is not limited to just protecting "mom and pop" operations from larger competitors has been made clear in various ways in prior jurisprudence:

- "However, we see nothing in the statutory language to indicate that the statute does not apply at all unless the seller intends to have or does have a particular market share." Gross v. Woodman's Food Mkt., Inc., 2002 WI App 295, ¶ 45.

- "Upon review we find nothing in the stated purpose of legislative intent that limits the Unfair Sales Act to "mom and pop" establishments. The purpose of the Act is to protect consumers against unfair pricing." Orion Flight Servs., Inc. v. Basler Flight Serv., 2006 WI 51, ¶ 31.

Ultimately, this case, like others, must focus on some of the most relevant purposes of the Act in order to comply with legislative intent.

In this case, the most important consideration for the Court is the "loss leader" nature of the Act which, it appears, is precisely what Costco is attempting to be. A "loss leader" or "leader" is defined as "a good or commodity sold at a very low price, usu[ally] below cost, to attract customers to buy other items." "LOSS LEADER," Black's Law Dictionary (11th ed. 2019). The Act was designed to prevent that. Specifically, "[t]he legislature sought by the unfair sales act to prevent transactions in which considered as a whole there was a sale of goods at less than cost for the

purpose of unfairly attracting business." <u>State ex inf. Heath v. Tankar Gas</u>, 250 Wis. 218, 222-223, 26 N.W.2d 647 (1947).

Costco, through its pricing of motor vehicle fuel, is an excellent example of everything that the Act is designed to prevent. It is the "big business" that has the ability to run comparatively smaller companies out of business. It is the "mass-merchandiser" with *substantial* economic power. Stated simply, though the Act protects fair competition for all retailers, regardless of size, it is the Wal-Marts and Costcos of the world that the Act most often protects smaller retailers from. It is against this statutory and jurisprudence backdrop that the Court should review the arguments of both Parties.

**2.  <u>Who is a "direct competitor" for purposes of "meeting competition" under Wis. Stat. § 100.30(6)(a)7.</u>**

A retailer is not in violation of the Act if it prices motor vehicle fuel below the "cost to retailer" price as permitted under the Act. The Act explicitly permits a retailer to price motor vehicle fuel "in good faith to meet an existing price of a competitor" if that price "is based on evidence in the possession of the retailer . . . maintained by the retailer . . . in the ordinary course of trade or the usual conduct of business". Wis. Stat. § 100.30(6)(a)7. The term "existing price of a competitor" is a defined word that means "a price being simultaneously offered to a buyer for merchandise of like quality and quantity by a person who is a **direct competitor of the retailer** . . . **and from whom the buyer can *practically* purchase the merchandise.**" Wis. Stat. § 100.30(2)(cj) (emphasis added). Simplified, a person is excepted from the strictures of the Act if it can prove that its price was set:

1.    In good faith (Wis. Stat. § 100.30(6)(a)7.);

2.    To meet a price being simultaneously offered to a buyer for merchandise of like quality and quantity by a person who is a direct competitor of the retailer **and** from whom the buyer can practically purchase the merchandise (Wis. Stat. § 100.30(2)(cj), (6)(a)7.; **and**

Case 1:20-cv-00738-WCG     Filed 09/16/22     Page 13 of 24 Document 117-20

3. The retailer has evidence in its possession and that it maintains as part of its ordinary course of trade or in the usual conduct of business that reflects the direct competitor's price. (Wis. Stat. § 100.30(6)(a)7.)

A retailer can also receive immunity from suit or prosecution if it files the statutory Notice with DATCP to inform the State it lowered its price to meet the "existing price of a competitor" (as defined in Wis. Stat. § 100.30(2)(cj)) on the day in which the price was lowered. Wis. Stat. § 100.30(7)(a). The failure to comply with this statute creates a **_rebuttable presumption_** that the retailer did **not** lower its price to meet the existing price of a competitor. Id. A retailer does not receive immunity if it fails to submit the Notice on the day that the price was lowered or if the alleged competitor does not satisfy the definition of "existing price of a competitor."

If a competitor prices motor vehicle fuel below the cost to retailer and fails to file a notification with the DATCP, it may rebut the presumption that it did not reduce its price to meet competition only by producing contemporaneous documentation that it was meeting the price "existing price of a competitor." The most common form of documentation utilized to prove that a retailer is meeting competition is a price survey. "Surveys" are defined as to what they must include in order to satisfy the "meeting competition" defense. ATCP § 105.009.

All of this begs the question, who is a "direct competitor"? Unfortunately, the Act does not clearly define who a "direct competitor" is. "When a statute does not define an essential term, [the Court must] examine the ordinary meaning of that term." Orion, 290 Wis. 2d 421 at ¶ 24 (citations omitted). Thus, the Court should not determine who a "direct competitor" is by simply looking to a Party's interpretation, but should establish "ordinary meaning" to that term.

In addition to being a "direct competitor" the meeting competition defense also requires that a "direct competitor" be one that a buyer "can practicably purchase the merchandise." "Practicably" is also not defined in the statutes but Merriam Webster defines "practicable" as being "capable of

being put into practice or of being done or accomplished." Merriam Webster Online, "Practicable" https://www.merriam-webster.com/dictionary/practicable?utm_campaign=sd&utm_medium=serp&utm_source=jsonld (retrieved August 26, 2022).

It is against that backdrop that the Court must determine who are Costco's "direct competitor" that a buyer can "practicably" purchase fuel from. The most comprehensive guidance that has been available for years – and now is reduced to formal guidance – has been DATCP. DATCP's guidance requires an objective determination that takes in multiple factors. It does *not* limit its review to whether a customer or two of a retailer may come from a particular area; instead it inquires into many more details to get a full picture of the what the competitive market is. Both Parties spend substantial effort in their briefs addressing this specific issue and, as litigants, they are in a much better position to address those factors than the WPMCA itself. Therefore the WPMCA will not engage in a comprehensive review of the same. The WPMCA will, however, note that it agrees with DATCP's analysis and believes there is no rational or reasonable interpretation of "direct competitor" that can support the allegation that a convenience store located twenty-two miles away from Costco (which is in a heavily populated and distinct urban market) can qualify as a "direct competitor".

While the WPMCA does not believe that regurgitating the Parties arguments regarding the particulars of this case will be beneficial to the Court, it does believe that providing the Court and the Parties with its independent research will. In the early 2000s, the WPMCA[25] commissioned GMAP Consulting of Lawrence, Kansas, to investigate the impact of a convenience store lowering its prices on its competition to determine who a "direct competitor" is. (*Amicus* Exhibit 1.) The location utilized for the analysis was central Wisconsin; Portage, Marathon, and Wood Counties to be precise, with a focus on the City of Wausau. Utilizing Wausau for the subject site was intentional

---

[25] Then the PMAW, Petroleum Marketers Association of Wisconsin.

Case 1:20-cv-00788-WCG   Filed 09/26/22   Page 15 of 24 Document 117-20

as it represents a relatively large urban community with a high density of convenience stores and retailers that is surrounded by numerous, much smaller, communities which are less dense and are representative of much of Wisconsin.

The results were not surprising to the WPMCA, its members, or common sense; a price reduction does not have a substantial impact on competition outside of a relatively small radius. In fact, the study found that outside of a three-mile radius, the reduction of price had no negative impact on other retailers. To wit:

> The overall result from the data surveys and the pricing scenarios run on the data from this study is that the trade areas of sites can be measured. This reveals that the trade area of a competitor that seeks to gain a price advantage by lowering their price has a realistic market area of **less than 3 miles**. The effects of the pricing impact are influenced by a number of factors such as distance, price reaction of the competition and facility offering. However **the measurable impact generally falls within the 3 mile radius of the site.** It is important to remember that these scenarios were based on sites currently existing within the market – a new competitor added to a trade area would potentially have a different impact.

(Ex. 1, "Implications", p. 5; emphasis added.) The important take away from this investigation is clear; a retailer is only impacted by a competitor lowering its price if that retailor is in very close proximity to the competitor. These closely located competitors are the "direct competitors" that the Act contemplates because a reduction in price by one of them has a direct and immediate negative impact on the retailers in its immediate vicinity. Those outside of the affected area may still be "competitors" but not the "direct competitors" that the Act permits an exception for. In other words, a station in Kaukauna may be a "competitor" of the Parties, but it is not a "direct competitor" that would permit *any* of the Parties current retail locations to lower their price below the "cost to retailer".

Two other points must be noted regarding this particular "meeting competition" matter. First, the fact that a customer or two purchases fuel from a retailer from well outside the area cannot make retailers in that customer's home "direct competitors." To accept Costco's argument that,

because a small number of individuals from outside of Green Bay travel to Green Bay and buy fuel there, those few customers' home markets are also "direct competitors", would lead to truly absurd results. For instance, if accepted, every season ticket holder who travels to Lambeau Field for Packers home games by automobile would make most retailors in the state, and perhaps even adjoining states, "direct competitors" of Green Bay retailers on gameday. Such clearly cannot, and should not, be the case.

Second, there is an issue of the word "practicably." It is not practical for someone to drive an hour, round trip, to get fuel. If someone needs gas, they are going to buy it near where they find themselves, not after embarking on an hour-long (round trip) road trip for fuel. It is simply not practicable for a consumer, shopping for fuel by any of the Parties' stores, to purchase that fuel in Kaukauna rather than Green Bay.

For all of these reasons it is important that the Court give great deference to the only body that has given guidance on "direct competition"; DATCP. It is similarly important that the Court apply an objective, rather than subjective, definition of "direct competitor" that can be utilized and relied upon by any retailer. Based upon the WPMCA's own independent research, coupled with DATCP's guidance, Costco's "direct competitors" should draw from a small pool where it is *practical* for a customer who needs motor vehicle fuel to get motor vehicle fuel.

3. **Prices posted and discounts offered are not a basis for "meeting competition".**

In Plaintiffs' brief, they point out that Costco's argument that they are permitted to meet a discount offered by a competitor by lowering its price to the discounted price is impermissible pursuant to Wis. Admin Code ATCP 105.009(1) Note. Plaintiffs' argument is accurate and no further comment is necessary as it relates to the clear language of this subsection of the Code.

That said, what *is* worth noting and what is not addressed in Plaintiffs' brief is the practical impact of allowing one to "meet competition" by lowering one's posted price to account for a

discount offered by a third party. As the Court is no doubt aware, the Act allows "direct competitors" to meet the "existing price of a competitor." Wis. Stat. § 100.30(6)(a)7. Accordingly, if the Court eschewed the clear and unambiguous language of Wis. Admin. Code ATCP 105.009(1), and its Note, then the following is a very real example of the never-ending price reduction which could occur:

1. Costco lowers its posted price to meet a discount offered by a direct competitor, then;

2. When the direct competitor sees that Costco lowered its posted price, the competitor could properly lower its posted price to meet Costco's posted price; then

3. Costco, noting the competitor's lowered posted price and the discount, once again lowers its price; then

4. This cycle continues until one of the competitors decides to let the other have a lower posted price (which will drive customers to it rather than its competitor).

It is for this very possible reason that DATCP long ago determined that "meeting competition" must be upon the "same terms and conditions as the competitor's offer" and promulgated rules to memorialize the same. The Court should recognize the importance of this regulation and reject Costco's attempt to create a "meeting competition" defense for its posted price based upon a discount offered by a competitor in direct violation of the Administrative Code.

**4. The language of the Act and the Administrative Code recognizes the difficulties of quantifying "injury or threat of injury" and is specifically tailored to address the same.**

The Unfair Sales Act and the administrative code that helps interpret it have numerous definitions and presumptions that recognize the reality that the impact of sales below costs can, at times, be difficult to prove. It is for this reason that the Act has been drafted, and amended, as it has. For instance, Wis. Stat. § 100.30(3) establishes that evidence of a sale below cost represents "*prima facie* evidence of intent or effect to induce the purchase of other merchandise, or to unfairly divert trade from a competitor, or to otherwise injure a competitor." Id. "*Prima facie* evidence" is

Case 1:20-cv-00788-WCG    Filed 09/16/22    Page 18 of 24    Document 117-20

"[e]vidence that will establish a fact or sustain a judgment unless contradictory evidence is produced." Black's Law Dictionary, p.598 "*prima facie* evidence," (8th ed. 1999). In other words, the mere existence of a "sale" below the "cost to retailer" represents sufficient evidence to find a violation of the Act unless a successful defense rebuts that presumption. To survive summary judgement, at least, nothing more is required of a retailer who alleges to have been injured or threatened with injury by a competitor. To the extent that an alleged violator presents evidence to the contrary, a factual issue is created that must be resolved at trial[26].

The inclusion of this *prima facie* language is not insignificant and, in fact, finds itself located in subsection (3) because the Wisconsin Legislature was unhappy with an interpretation by the Wisconsin Supreme Court and it sought to undo the same. Specifically, in Heiden v. Ray's Inc., the *prima facie* language was found only under the "Penalties" subsection which was, at that time, located in subsection (4). Id., 34 Wis. 2d 632, 150 N.W.2d 467 (1967). Subsection (4) applied to the criminal and regulatory enforcement of the Act. After the Heiden decision, the Legislature moved the *prima facie* language from subsection (4) to Wis. Stat. § 100.30(3) (which has application to civil remedies as well as criminal and regulatory enforcement), the "Illegality of Loss Leaders" section, and added language that such sales "are prohibited."

A brief review off Heiden demonstrates that the Heiden Court recognized a difference between the subsections of the Act at that time by stating, "Plaintiff in this respect confuses the Unfair Sales Act's criminal and civil remedies." Id. at 638-369. The Court went on to note that under subsection (4), there is a *prima facie* presumption and that the same was recognized in State v. Ross. Id. at 639, referencing State v. Ross, 259 Wis. 379, 48 N.W.2d 460 (1951). In other words, the Court's decision in Heiden was limited based upon the fact there was no *prima facie* language

---

[26] Assuming that none of the defenses under Wis. Stat. § 100.30(6)(a) exist and the alleged violator has not provided notice as required by Wis. Stat. § 100.30(7).

under subsection (5).  By moving the *prima facie* language to the "Illegality of Loss Leaders" section, the Legislature clearly indicated it did not desire the *prima facie* language be narrowly applied; the Legislature made it clear that private parties suing under § 100.30(5m) should also benefit from the *prima facie* evidence.  In this way, the Legislature gave greater "teeth" to the Act.

No case since <u>Heiden</u>, and the subsequent amendment to the Act, has reiterated the proposition that the *prima facie* evidence provision contained within the statute is not sufficient for a plaintiff to carry its burden.  Instead, <u>Heiden</u> has been questioned by subsequent cases.  See <u>Go America, LLC v. Kwik Trip, Inc.</u>, 2006 WI App 94, ¶ 34 n.11, 292 Wis. 2d 795, 715 N.W.2d 746.  More importantly for this Court, the case of <u>Ross</u> indicated that the *prima facie* evidence provision of the Act can be sufficient for any plaintiff (in <u>Ross</u>, the State) to carry its burden.  <u>Id</u>., 259 Wis. at 386.  Accordingly, this Court should recognize that proof of sale below cost is sufficient evidence to establish evidence of intent to injure a competitor[27].

Further, the Act does not require *actual* injury for a plaintiff to be successful in its claim as Costco argues.  Costco's argument ignores the fact that the statute *does not* require an actual injury.  Rather, the Act provides that one "threatened with injury" may recover under the Act.  Wis. Stat. § 100.30(5m).  A "threat" is "someone or something that **could** cause trouble, harm, etc." (emphasis added)  Merriam-Webster Online "threat" <u>available at</u> <u>http://www.merriam-webster.com/ dictionary/threat</u>. It can also be defined as "the **possibility** that something bad or harmful could happen."  <u>Id</u>.  A "threat" of injury, then, does not require an injury.  Instead, a threat of injury need only be a possibility that something that could happen.

The reason for both of these statutory provisions is clear; proving actual injury can be difficult to do.  There are some obvious examples.  For instance, if a retailer lowers its price to match the violator, the retailer is selling its fuel for less than it otherwise would have.  In such

---

[27] Although, of course, this presumption may be rebutted at trial.

{07813256.DOCX.2}                                        Page **20** of 24

Case 1:20-cv-00387-WCG   Filed 03/25/22   Page 20 of 24   Document 17-20

circumstances, courts have found that lower sale price itself is proof of injury. See e.g. Gross v. Woodman's Food Market, Inc., 259 Wis. 2d 181, 655 N.W.2d 718 (Ct. App. 2002). But what about in other cases, where a retailer chooses not to lose its profit margin and does not lower its price; is that party not still injured? The answer must be that the competitor is injured regardless of their decision of whether to match the unlawful price.

As a preliminary matter, it is disingenuous to look merely at the alleged injured party's sales. It is well-known in the industry that the number of gallons of fuel sold fluctuate (and can fluctuate substantially) for reasons other than cost. It may be seasonal, it may be due to holidays, it may be due to rising (or lowering) prices of fuel across the market, it may be due to costs being charged by other competitors in the market, it may be due to any number of reasons really. But, ultimately, some days more fuel will be sold than others. Thus, gallonage is not a strong indication of whether someone is injured or threatened with injury.[28]

Further, if a retailer chooses not to lower its price to match its competitor, common sense dictates that it will lose customers. Such a proposition is not only common sense, it is an issue that has been researched and proven. In fact, NACS (the North American Convenience Store Association) has researched this issue for years and, with its most recent report, has found that despite price being less important than it once was, it still remains the most important factor for consumers in choosing where to buy fuel. "Consumer Behavior at the Pump", page 6, https://www.convenience.org/topics/fuels/documents/how-consumers-react-to-gas-prices.pdf (March 2019). *How* one can prove it lost customers, however, is a mystery. Short of surveying all of its competitors' customers (which is both not practical and would surely not be facilitated by a competitor), how can a retailer determine why customers chose to shop with a competitor rather than the retailer? Stated simply it cannot.

---

[28] Although it surely could be a consideration, especially if there is a pattern present.

Related to that potential lost fuel customer, the retailer also loses the opportunity to get that customer into its store where the retailer enjoys a more healthy profit margin. It is well known in the industry (and presumably beyond), that the markup for the items sold inside the store are FAR greater than the margin sold on fuel. Once again, thanks to NACS, we know that the national average gross margin for fuel in 10.2%, while "virtually any item inside the store" has a better profit margin. Fuel Sales Fact Sheet, https://www.convenience.org/Research/FactSheets/FuelSales, (Accessed August 26, 2022). The inside sales, then, are believed to make up 2/3 of a retailer's overall profits. "Consumer Behavior at the Pump", page 10. Thus, when a customer is taken by a competitor using an illegal price, the retailer loses out not only on the fuel sale (which admittedly may have a very small profit margin) but it also loses out on the possibility of an inside sale with a larger profit margin. Once again, there is no practical way for a retailer to determine how many additional inside sales it would have made had the competitor not made a sale in violation of the Act. By the inclusions of *prima facie* evidence and accepting that one may recover for both an actual injury or **threat** of injury, the legislature sought to foreclose the vey arguments advanced by Costco here.

Finally, the Act also provides a presumption that any competitor that fails to provide notice of its reduced price to DATCP meet the competition of a "direct competitor" did not do so to meet the "existing price of a competitor." Once again, the Legislature has clearly placed the onus of a "good faith" retailer who is lowering its price below the "cost to retailer" to "meet competition" on the retailer lowering its price; not on the alleged injured party. While the alleged violator may offer evidence to refute this presumption, all the same accomplishes is an issue of fact which must be resolved at trial.

Ultimately, the Act is specific and clear in its design and purpose. With the use of *prima facie* evidence, acknowledging a "threat" of injury to be actionable, and creating a rebuttable presumption

Case 1:20-cv-00738-WCG    Filed 08/26/22   Page 22 of 24  Document 117-20

against a retailer which lowers its price below the "cost to retailer" but does not notify DATCP of the same, the Legislature clearly intended to reject many of the very arguments raised by Costco in this matter.

**CONCLUSION**

The Act protects all retailers of motor vehicle fuel by providing a fair, level, playing field for all that are in it. Consistent with its stated purpose, the Act increases competition by preventing larger companies from running smaller companies out of business with unfair pricing practices. While it seems axiomatic that the "markup" provisions of the Act would increase prices to the consumers, that is not in practice what occurs. Instead, the Act has allowed Wisconsin consumers to enjoy fuel prices that rarely deviate more than a few cents from the national averages. It has allowed smaller, mom and pop, retailers to remain in business despite competition from larger retailers and, thus, has kept Wisconsinites employed and has provided them with access to multiple options all striving to win the customer by offering better products and service to attract patronage rather than preying on their competition through unsustainably low prices. The Act is working in Wisconsin and has been shown to be beneficial in other states that have similar laws[29].

The benefits of the Act all hang in the balance as the Court determines this matter. Adoption of Costco's "meeting competition" arguments would undermine the Act to such a degree that it would be almost impossible for smaller retailers to compete with the large retailers who have multiple sources of revenue and the ability to offset losses at the pump with profits from other revenue streams. The Court should reject these arguments and continue to allow Wisconsin retailers to compete for customers in an honest and sustainable manner.

---

[29] By way of example, Minnesota repealed their version of the Act in 1995 and saw a rise in gas prices. Accordingly, the law was reinstated in 2001 as to motor vehicle fuel retailers to protect both the businesses in Minnesota as well as the consumers.

Dated this the 29th day August, 2022.

**DEMPSEY LAW FIRM, LLP**
Attorneys for Wisconsin Petroleum
Marketers & Convenience Store Association

By: *s/ Electronically Signed by Heath G. Mynsberge*
       Heath G. Mynsberge
       Wisconsin Bar No. 107982

**Address:**
Dempsey Law Firm, LLP
210 N. Main St., Ste. 100
Oshkosh, WI 5490
Telephone:     920-235-7300
Fax:           920-235-2011
Email:         hgm@dempseylaw.com